**HIGHLY CONFIDENTIAL**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **JAMES PATRICK PHILLIPS,** | ) | **CRIMINAL NO. H—4-512-S S** |
| | ) | |
| **WESLEY C. WALTON,** | ) | |
| | ) | |
| **JAMES BROOKS,** | ) | |
| | ) | |
| **Defendants** | ) | |

**ADDITIONAL EXPERT REPORT OF BENJAMIN SCHLESINGER, PH.D.**

**November 4, 2009**

**Background**

1. My name is Benjamin Schlesinger. I am president of Benjamin Schlesinger and Associates, LLC ("BSA"), an economic and strategic consulting firm focused on the natural gas industry. BSA is located at 7201 Wisconsin Avenue, Bethesda, Maryland, and is a part of the Galway Group, L.P., of Houston, Texas. I hold A.B. and B. Engineering degrees from Dartmouth College and M.S. and Ph.D. degrees in Industrial Engineering (now, Management Science and Engineering) from Stanford University. A copy of my current curriculum vitae is appended to this report as Exhibit 1.

2. I have previously filed testimony in this proceeding, which is appended to this report as Exhibit 2, Expert Report of Benjamin Schlesinger, Ph.D., November 23, 2007.

3. Counsel for the Defendants asked me to review and comment on a seven-page table entitled "El Paso's Gains (Losses) from Defendants' False Reporting" that I understand was prepared by the Brattle Group (herein, the Brattle Tables). I was also shown Presentence Investigation Reports (PSR) for each of the Defendants, which were prepared by or under the supervision of United States Probation Officer Mitchell R. Ott. Each of the PSRs mentions and cites the Brattle Table at various points. Finally, I was asked by counsel for Mr. Brooks to review the reasonableness of mathematically removing one single company, such as El Paso, from trade press reports, and then observing how this does or doesn't change the resulting gas price index value.

4. As indicated in Exhibit 1 to this report, I was deeply involved in the formation of gas spot trading and open markets in the United States during the two decades leading up to the period of time covered in the Brattle Table, i.e., 2000-2002. From 1983 on forward, I advised clients in how gas markets would evolve, where the data would come from, pressures that led to the rise of trading as a hitherto unused commercial mechanism in the gas industry. In 1984, I consulted with Oil Daily in designing the survey and procedures leading up to the first methodical gas trade press price reporting in the U.S. From 1984 through 2000, I was a

1    member and active participant in the New York Mercantile Exchange (NYMEX)
2    Natural Gas Advisory Committee. I helped NYMEX in selecting and justifying
3    Henry Hub as the point of physical delivery in the natural gas futures contract,
4    and in preparing the futures contract and necessary regulatory filings.
5    5.  In these efforts and other assignments prior to and contemporaneously with the
6        period of time covered in the Brattle Table, I was keenly aware of the industry's
7        evolution and commercial issues, including the commonly understood need for
8        trade press price reporters to anticipate and filter away biased price reports. I
9        urged price reporters to develop their own understanding of the market and its
10       participants, and to learn to exercise their judgment in developing price indices of
11       the kind discussed in this proceeding. While it was statistically important to
12       gather as much data as possible at each price reporting point, industry participants
13       understood that purely relying on statistical manipulation, e.g., blindly calculating
14       volume weighted averages (VWA), would not be a proper or appropriate way to
15       arrive at price indices. This was so because survey respondents each had their
16       own market perspectives, and would be expected to report their own biases. Only
17       through collection of enough data, and exercise of the reporter's judgment, could
18       a good index price be arrived at.
19
20   **The Brattle Tables**
21
22   6.  Page 1 of the Brattle Tables document contains a three-row summary table that
23       lists each Defendant, row by row, and presents a total amount of El Paso's
24       purported gains and losses by defendant and by trade press, including Inside
25       FERC (IF) and Natural Gas Intelligence (NGI).
26   7.  Page 2 through Page 7 of the Brattle Tables document contain a six-page table
27       with eleven columns that I understand refer, in order, to the following, with
28       column numbers as on the table:
29
30       1)  Reported By – the El Paso person sending in the trade press report
31       2)  Count – the number of reports that person sent

  3) Month – the month in which the prices were intended to take effect
  4) Location – the point where each price reported was intended to apply
  5) Publication – either IF or NGI
  6) Price Effect – explained as the change in the publication's VWA from removing Defendant's false reports
  7) El Paso Position – the number of equivalent 10,000 MMBtu contracts which were held by El Paso, positive if El Paso stood to gain from an increase in the index price, and negative otherwise.
  8) El Paso Gain / Loss – the product of Columns (6) and (7) times 10,000, to arrive at a dollar amount.
  9) Mr. Brooks? – responsibility indicated by a "Y" or "N"
  10) Mr. Phillips? – responsibility indicated by a "Y" or "N"
  11) Ms. Walton? – responsibility indicated by a "Y" or "N"

8. Notes at the bottom of the Brattle Tables explain the foregoing in further detail.

**Summary of Conclusions**

9. In determining how useful the Brattle Tables are in assessing gains and losses caused by the Defendants' actions, I have examined spreadsheets obtained in response to a Grand Jury subpoena in these proceedings. The spreadsheets included transactions carried out by a number of gas trading and marketing companies, as well as spreadsheets submitted by trade press containing back-up to their monthly index price reports. In addition, I reviewed other information and exhibits in the record, which I append to this report.

10. I have reached the following conclusions in my analysis:

11. First, the Brattle Tables say nothing about the degree to which El Paso was hedged in its transactions in ways that would reduce its exposure to changes in index price levels for any reason, let alone false reporting. Hedging was quite common among firms involved in gas trading in 2000-2002. Columns 7 and 8 of the Brattle Tables are not reliable to the extent they fail to consider hedging, and

1       thus they overstate El Paso's actual dollar exposure. In my November 2007
2       report in these proceedings, I demonstrated that one marketer, Duke Energy
3       Trading & Marketing, had approximately 98 percent of its transactions hedged;
4       the hedge practices of other marketing companies varied but were similar.
5       Hedging reduces exposure to the index, thus if only 90 percent of El Paso's
6       transactions were hedged, for example (a far lower portion than I would expect),
7       then El Paso Gains/Losses shown in the Brattle Tables must be reduced by 90%.
8   12. Large-scale hedging activity among gas buyers and sellers in the 2000-2001 time
9       period comports with my own understanding and experience. By the end of the
10      1990s, exposure to changes in gas price indices had been reduced within the gas
11      trade. Even gas distribution utilities and gas-buying municipalities that I advised
12      in my consulting practice were prone to hedge gas purchases in order to manage,
13      and reduce, their exposure to price risks. The California Public Utilities
14      Commission (CPUC) had already, by 2000, published guidance to gas utilities
15      within its regulatory purview on price risk management and hedging activity.
16   13. Second, most of the figures in Column (6) in the Brattle Tables are quite small.
17      Of the 124 observations in the table containing data, 103 or 83% show a Price
18      Effect of $.01 to $.03 per MMBtu. In my opinion, differences of $0.01 to $0.03
19      per MMBtu are below the level of accuracy in the gas trade press reporting
20      business; they are in the noise. Exhibit 3 to this report demonstrates that such
21      differences are common among the several trade press reports for a single location
22      and month. Again, this comports with my own experience in advising gas buyers
23      and sellers in commercial contracting activities. We have always recommended
24      to parties entering into multi-month gas sales and purchase contracts (SPAs) that
25      they index prices to more than one trade press report for exactly this reason. No
26      single trade press report is completely reliable, and small variations in index are
27      common and below the expected level of accuracy. Thus, multiple trade press
28      reports should be relied on for pricing purposes, not just one, e.g., using the
29      average of two or three trade press indices representing gas prices during the same
30      month and same location. If transactions for which a Price Effect within the
31      normal error range of plus or minus $.01 to $.03 per MMBtu are excluded, then

the Brattle Table at Page 1 would show no gains to El Paso attributable to Mr. Walton or Mr. Phillips, as follows:

**Table 1**

**El Paso's Gains (Losses) Accounting for Measureable Price Effects Only**

|  | False Reporting to Inside FERC Attributed to Defendant | False Reporting to NGI Attributed to Defendant | Total |
|---|---|---|---|
| Mr. Brooks | $ (219,380) | 4,468,530 | 4,249,150 |
| Mr. Phillips | $ (195,034) | 0 | (195,034) |
| Mr. Walton | $ (195,034) | 0 | (195,034) |

**Company-by-Company Price Effects**

14. It is indicated in the PSR for Mr. Brooks that removing all the El Paso transactions causes changes in index prices, thus expressing the notion that the company's effect on price indices was considerable. My concern with this kind of approach is that it could unfairly exaggerate Price Effects caused by the Defendants, since one could reasonably make the exact same statement about other companies' reports, i.e., removing them singly also causes changes in the VWA in many months.

15. For example, a Price Effect on the September 2000 NGI Southern California Border Average ("Socal") of $0.33 per MMBtu is attributed to Mr. Brooks. VWA's of each of the 17 companies included by NGI in computing its September 2000 Socal index gas price are shown in Exhibit 4 to this report. It can be seen on Page 2 of the exhibit that El Paso's inclusion in the average reduced it by $.06/MMBtu. However, inclusion of price reports submitted by five other companies changed the overall VWA by that amount or more; PanCanadian's and Enron's reports raised the VWA by $.16 per MMBtu and $.11 per MMBtu, Westcoast's and PG&E Trading's reports lowered the VWA by $.06 per MMBtu,

just like El Paso Merchant's reports did, and so on. Thus, it is quite meaningless – and it is in fact unfair – to draw conclusions about the effects of Defendants' behavior based on removing only El Paso Merchant's data from the VWA.

16. A closer examination of price trends during bid week for September 2000 is shown in Exhibit 5, which contains data for Socal in September from Inside FERC Gas Market Report.[1] It is clear that Bid Week gas prices were highly volatile from August 25 through the end of that month, August 31, and that there was a generally declining price trend at the time, as shown in the exhibit. I conclude that differences in company-by-company gas price reports for September 2000 may have more to do with when they were filed (i.e., nearly all of El Paso Merchant's price reports were filed on the last day of the month, when market prices appeared to be the lowest) than how they may have deviated from the overall VWA, from a perspective of commenting on one company's data compared to the average of the others.

**Conclusions and Discussion**

17. I conclude that the Brattle Tables cannot be relied upon in these proceedings. They grossly overstate El Paso's Gains (Losses) because a) they ignore hedging practices that were well in effect in the gas marketing and trading industry at least since 1990 when NYMEX began trading natural gas futures and b) they include transactions with Price Effects that are not measureable because they lie within $0.01 to $0.03 per MMBtu, thus should be excluded as they fall within the usual error range in gas price reporting. Correcting for the foregoing factors results in the El Paso Gains (Losses) shown in Table 1 above.

18. It is worth note that Brattle could have examined data filed in this proceeding that demonstrates hedging practices of marketing companies and others. I was not privy to this information, however, my experience both as an expert and as an analyst in the formative years of open gas markets tells me that most transactions

---

[1] Data supplied by NGI in response to the Grand Jury Subpoena does not include the dates within Bid Week when individual price reports were filed.

1 were hedged.
2 19. Finally, I conclude that it does not make sense in the 2000-2001 time frame to
3 compare company-versus-company price reports because markets were highly
4 volatile at the time.  Such differences had more to do with when the price reports
5 were filed during Bid Week that what they said, thus it is unreliable, and unfair, to
6 assert Price Effects of the Defendants' actions on this basis.